## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SANYO ELECTRIC CO., LTD,

     Plaintiff,

v.

INTEL CORPORATION,

     Defendant,

C.A. No. 18-1709-RGA

## **Memorandum**

Plaintiff, Sanyo Electric Co., Ltd., originally filed this suit in the Court of Chancery of

the State of Delaware against Intel Corporation alleging state law causes of action and seeking

declaratory and injunctive relief as to the parties' rights under a 2006 patent cross-license

agreement ("Cross License Agreement"). (D.I. 2, Ex. A)[1]. Sanyo asserted four claims against

Intel complaining of Third Party Interference, Intentional Interference, Trespass to Chattels, and

requesting a declaration that Intel is not authorized to sell wireless communication modules

under the Cross License Agreement. (D.I. 2, Ex A at ¶¶ 128-78). Intel filed a notice of removal

to this Court, asserting that this Court has original jurisdiction of this case under 28 U.S.C. §

---

[1] The Cross License Agreement is attached as Exhibit 1 to Exhibit A to the Notice of Removal. (D.I. 2, Ex. A at Ex. 1).

1338(a). (D.I. 2 at 1). Intel asserts at least one of Sanyo's claims and at least one of Intel's counterclaims "arise under" federal patent law. (*Id.*).

Presently before this Court is Sanyo's Motion to Remand for lack of federal jurisdiction. (D.I. 11 at 1). The issues have been fully briefed. (D.I. 12, 16, 22). For the reasons set forth below, Sanyo's Motion is GRANTED, and this action will be remanded to the Court of Chancery of the State of Delaware.

## I.    Background

Sanyo filed this action against Intel in the Court of Chancery of the State of Delaware on October 7, 2018. (D.I. 2, Ex. A). Sanyo and Intel negotiated the Cross License Agreement over a period of eighteen months. (D.I. 2, Ex. A at ¶ 2 and Ex. 1). At its heart, the Agreement identifies the categories of products Intel can make and sell under patents Sanyo owned at the time, and vice versa. (D.I. 2, Ex. A at ¶ 25).

In addition, and critical to resolving this motion for remand, the Cross License Agreement contains a forum selection clause, which in pertinent part provides that: "All . . . litigation arising out of or related to this Agreement, . . . shall be subject to the exclusive jurisdiction of the courts of the State of Delaware or of the Federal courts sitting therein. Each Party . . . hereby irrevocably submits to the personal jurisdiction of such courts and irrevocably waives all objections to such venue." (D.I. 2, Ex. A at Ex. 1, § 6.9).

In 2011, Sanyo sold certain of its patents to Hera Wireless S.A., including patents concerning Wi-Fi technology, pursuant to a patent assignment agreement. (D.I. 2, Ex. A at ¶¶ 9, 97). While Hera took all right, title, and interest in the patents, the assignment agreement grants Sanyo a portion of the revenues that Hera receives through licensing or patent infringement

enforcement activities. (*Id*. at ¶ 98). The assignments were recorded with the U.S. Patent and Trademark Office. (D.I. 2, Ex. B (Intel's Answer and Counterclaims) at Counterclaim ¶ 17 ("According to . . . the assignment records of the U.S. Patent and Trademark Office, Sanyo assigned the nine asserted [Wi-Fi] patents after the Cross License became effective.")). Intel does not dispute that Hera—not Sanyo—owns the patents. (*See id.*).

Beginning in July 2017, Hera and its authorized licensing company, Sisvel UK Limited, sued several companies for patent infringement, including Intel's customer Lenovo—*Hera Wireless S.A. and Sisvel UK Ltd. v. Lenovo Holding Co., Inc.*, No. 17-1088 (RGA). (D.I. 2, Ex. B at Counterclaim ¶¶ 16, 24–26, 32, 34–42). Those cases are now before this Court.[2] In particular, Hera and Sisvel have asserted nine of the patents that Hera purchased from Sanyo (the "Wi-Fi Patents")[3] against Lenovo. (D.I. 18 (Campbell Decl.), Ex. 4 at ¶¶ 10-23).

Many Lenovo laptops use Intel integrated circuit chips that manage wireless communications. Believing that Hera's infringement theory was unavoidably aimed at its chips' functions, Intel demanded, under the Cross License Agreement between Sanyo and Intel, that Sanyo confirm that Sanyo had conditioned its assignment of patents to Hera on Intel's license rights as Section 6.13 of the Cross License Agreement required. Intel further sought Sanyo's consent to disclose the Cross License Agreement to Hera and Sisvel and to communicate a

---

[2] *See, e.g., Hera Wireless SA v. Lenovo Holding Company, Inc.*, Civ. No. 1-17-cv-01088-RGA (D. Del.) *Hera Wireless SA v. LG Electronics, Inc.*, Civ. No. 1-17-cv-01089-RGA (D. Del.) (terminated May 9, 2018); *Hera Wireless SA v. Amazon.com, Inc.*, Civ. No. 1-17-cv-00947-RGA (D. Del.) (terminated Jan. 14, 2019); *Hera Wireless SA v. ARRIS Group, Inc.*, Civ. No. 1-17-cv-00948-RGA (D. Del.); *Hera Wireless SA v. Belkin International, Inc.*, Civ. No. 1-17-cv-00949-RGA (D. Del.); *Hera Wireless SA v. Buffalo Americas, Inc.*, Civ. No. 1-17-cv-00950-RGA (D. Del.) (terminated May 2, 2018); *Hera Wireless SA v. Netgear, Inc.*, Civ. No. 1-17-cv-00951-RGA (D. Del.); *Hera Wireless SA v. Roku, Inc.*, Civ. No. 1-17-cv-00952-RGA (D. Del.).

[3] The Wi-Fi Patents asserted in Hera's various complaints are: U.S. Patent Nos. 7,962,103 (Appl. No. 12/463,657); 8,412,115 (Appl. No. 13/098,878); 8,934,851 (Appl. No. 13/786,888); 9,270,024 (Appl. No. 14/532,095); 8,295,400 (Appl. No. 11/222,221); 7,369,878 (Appl. No. 11/375,080); 7,454,234 (Appl. No. 11/375,078); 7,873,389 (Appl. No. 11/898,287); and 8,737,377 (Appl. No. 11/477,429).

demand to dismiss infringement allegations based on Intel's chips. (D.I. 18, Ex. 7). After Sanyo consented to that disclosure, Intel wrote to Hera and Sisvel in October 2017 outlining in significant detail why Intel's chips were licensed to the asserted patents under the Cross License Agreement. (D.I. 18, Exs. 8 & 9).

Intel's October 2017 letter further detailed why the infringement theory against Lenovo would necessarily contend that Intel's licensed chips satisfy allegedly inventive aspects of the patent claims resulting in exhaustion of the infringement claims against computers that incorporate those chips. (D.I. 18, Ex. 9). Intel therefore demanded that Hera and Sisvel dismiss laptops with Intel chips from their lawsuit against Lenovo. (*Id.*). In November 2017, Hera and Sisvel wrote that they were working "with Sanyo to analyze the proper scope of the license," and in January 2018, they refused Intel's demand. (D.I. 18, Ex. 10).

After Hera and Sisvel refused Intel's demand to dismiss infringement allegations based on Intel's chips, Intel wrote to Sanyo explaining that Sanyo had breached its non-delegable obligations under the Cross License Agreement by assisting and encouraging Hera and Sisvel to ignore Intel's license rights and Lenovo's resulting exhaustion defense. (D.I. 18, Ex. 11). Intel also explained that "before Intel may file suit to remedy Sanyo's breach of contract," Sanyo and Intel must have their senior executives meet to discuss the dispute and then participate in a formal mediation as set out in the procedure of Section 6.10 of the Cross License Agreement. (*Id.*). At Intel's request and insistence, the senior executive meeting was held, and (later) a mediation was held and concluded without reaching resolution. (D.I. 18, Ex. 2 at ¶ 28; Ex. 8; Ex. 12). During the executives' meeting, Intel presented a detailed slide-show, reiterating its demand that Sanyo confirm Intel's license rights under the Cross License Agreement and cause

Hera to dismiss its infringement claims against Lenovo computers with Intel chips because the patents were exhausted as to such claims. (D.I. 18, Ex. 12). Sanyo refused to do so.

Sanyo alleges that in September 2017, Intel began falsely asserting that the Cross License Agreement authorizes Intel to make or sell wireless communication modules, and that Hera's patent rights in Intel's customers' products incorporating wireless communication modules are exhausted under the doctrine of patent exhaustion. (D.I. 2, Ex. A at ¶¶ 13, 15, 109-13). After attempting to resolve the dispute for over a year, on October 7, 2018, Sanyo sued Intel in the Court of Chancery of the State of Delaware. (D.I. 2, Ex. A at ¶ 20). In its complaint, Sanyo sought a judgment declaring that Intel is not authorized to make or sell wireless communication modules under the Cross License Agreement and asserted additional state law claims for interference with contract and trespass to chattels.

Specifically, Sanyo's Complaint alleges the following claims: Third Party Interference (D.I 2, Ex. A at ¶¶ 147-55); Intentional Interference (D.I. 2, Ex. A at ¶¶ 155-66); Trespass to Chattels (D.I. 2, Ex. A at ¶¶ 167-78); and a Declaratory Judgment that Intel is not authorized to sell wireless communication modules under the Cross License Agreement (D.I. 2, Ex. A at ¶¶ 128-46).

On October 29, 2018, Intel served its Answer and Counterclaims. (D.I. 2, Ex. B). Intel alleges the following counterclaims: Breach of Contract (D.I. 2, Ex. B at Counterclaim ¶¶ 43-54); a Declaratory Judgment that non-party-Hera's infringement claims are exhausted and the asserted Wi-Fi Patents are unenforceable as to Lenovo laptop computers that contain the accused Intel Wi-Fi chips (D.I. 2, Ex. B at Counterclaim ¶¶ 55-59); and a Declaratory Judgment that the asserted Wi-Fi patents that are owned by non-party Hera are unenforceable because they are invalid over the prior art (D.I. 2, Ex. B at Counterclaim ¶¶ 60-64).

Intel's fifth affirmative defense, that "Hera's infringement claims for the asserted [Wi-Fi] Patents are exhausted as to the Lenovo laptop computers that use the Intel Wifi Chips," and its sixth affirmative defense, that "the claims of the asserted [Wi-Fi] patents that Hera is pursuing are invalid and unenforceable in view of the prior art," are related to these counterclaims. (D.I. 2, Ex. B at ¶¶ 184–85)

In its answer in *Hera v. Lenovo*, Lenovo pled several defenses, including that the infringement claims under the asserted patents are exhausted, in whole or in part. (D.I. 18, Ex. 5 at ¶ 165). In this case, Sanyo has alleged that Lenovo's exhaustion defense in *Hera v. Lenovo* is the direct result of Intel communicating and supporting its position that the infringement claims against Lenovo computers containing Intel licensed chips are barred under the doctrine of patent exhaustion. (D.I. 18, Ex. 1 at ¶ 118).

On October 30, 2018, Intel removed the case to this Court. (D.I. 2). Intel claimed to have removed this action based on 28 U.S.C. §§ 1338(a), 1441, and 1454, on the ground that this Court has jurisdiction over one or more of Sanyo's claims and one or more of Intel's counterclaims because those claims arise under the patent laws or raise substantial questions of patent law. (D.I. 2, at 1). Intel also contends that supplemental jurisdiction, under 28 U.S.C. § 1367, exists over any claim or counterclaim that does not raise a substantial question of federal patent law. (*Id.*).

Sanyo filed its motion to remand, claiming this Court lacks jurisdiction over the parties' claims because they do not arise under the patent laws, do not satisfy the case-or-controversy requirement, or both.

## II.    Legal Standard

Upon removal of an action, a plaintiff may challenge such removal by moving to remand the case back to state court. 28 U.S.C. § 1447. As is the case here, "a motion to remand based on lack of subject matter jurisdiction may be made at any time before final judgment," *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1212-13 (3d Cir. 1991) (citing 28 U.S.C. § 1447(c)).

"The party asserting jurisdiction bears the burden of showing that at all stages of the litigation the case is properly before the federal court." *Samuel-Bassett v. KIA Motors America, Inc.*, 357 F.3d 392, 396 (3d Cir. 2004). "The statute governing removal, 28 U.S.C. § 1441, must be strictly construed against removal." *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 219 (3d Cir. 2005) (citing *Samuel-Bassett*, 357 F.3d at 396).

A district court has subject matter jurisdiction over cases removed from state court for their assertion of federal patent law claims. Under 28 U.S.C. § 1454, "[a] civil action in which any party asserts a claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights may be removed to the district court of the United States." More generally, pursuant to 28 U.S.C. § 1441, a defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." A district court has original jurisdiction over a civil action "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, as well as "any Act of Congress relating to patents, plant variety protection, copyrights and trademarks," 28 U.S.C. § 1338(a).

A case "aris[es] under" federal law, and therefore may be removed to federal court, when "federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013); *see* 28 U.S.C. §§ 1331, 1338(a), 1441, 1454. For example, federal law "creates" various patent causes of action under Title 35 of the United States Code. *See Gunn*, 568 U.S. at 257 (citing 35 U.S.C. §§ 271, 281). A case may also "aris[e] under" federal law when a "state-law claim

necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal

forum may entertain without disturbing any congressionally approved balances of federal and

state judicial responsibilities." *Gunn*, 568 U.S. at 258 (quoting *Grable & Sons Metal Prods. v.*

*Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)). In other words, under the *Gunn* test,[4] "federal

jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually

disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the

federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. All four factors must

support federal jurisdiction, and jurisdiction pursuant to this test is rare. *Manning*, 772 F.3d at

163 ("Because we conclude that no federal issue has been necessarily raised here, we need not

decide whether the other three *Grable* requirements are met."). But, "the mere presence of a

federal issue in a state cause of action does not automatically confer federal-question

jurisdiction." *Merrell Dow Pharm. Inc. v. Thompson,* 478 U.S. 804, 813 (1986).

## III.    Discussion

### A.  Intel Did Not Waive Removal of this Dispute in the Forum Selection Clause of the Cross License Agreement

Sanyo contends that Intel's removal to this Court breached an express provision of the

Cross License Agreement. The licensing agreement between Sanyo and Intel includes a forum

selection clause in which the parties agreed to submit to the jurisdiction of the courts of the State

of Delaware or the Federal courts sitting therein and to irrevocably waive all venue objections:

> 6.9 Jurisdiction. All disputes and litigation arising out of or related to this Agreement,
> including without limitation matters connected with its performance, shall be subject to
> the exclusive jurisdiction of the courts of the State of Delaware or of the Federal courts
> sitting therein. Each Party and each Granting Subsidiary hereby irrevocably submits to

---

[4] This test is also referred to as the *Grable* test. *See Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 772 F.3d 158, 163 (3d Cir. 2014), *aff'd*, 578 U.S. ___, 136 S. Ct. 1562 (2016). Because the parties in this case refer to the *Gunn* test, the Court will, as well.

the personal jurisdiction of such courts and irrevocably waives all objections to such venue.

(D.I. 2, Ex. 1, § 6.9).

Sanyo contends that the Third Circuit and this Court have repeatedly interpreted similar language as waiving a party's rights to remove a matter from state court. Its view is that such language is viewed as an agreement to be sued in, "*and stay in*," the plaintiff's chosen forum. *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1217 (3d Cir. 1991) (emphasis in original). In *Foster*, the Third Circuit affirmed a remand to the state court involving the following forum selection clause, which provided that if certain circumstances were satisfied,

> the Retrocessionaire [Chesapeake], . . . at the request of the Company [Mutual Fire], will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction; and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

*Foster*, 933 F.2d at 1216 (alterations in original). The Third Circuit held that by "consenting to 'submit' to 'any court' of competent jurisdiction" "at the request of the Company," and to "comply with all requirements necessary to give such court jurisdiction," Chesapeake agreed to go to, "*and stay in*," the forum chosen by Mutual Fire. *Id.* at 1216-17. The Third Circuit held that the lower court correctly interpreted this clause as a waiver of the right to remove, in accord with a long line of cases considering similar language. *Id.*

But, on its face, the agreement in this case states that either federal or state court is permitted so long as the court is in Delaware. Facing similar language and analogous circumstances, courts in this circuit have rejected attempts like Sanyo's to transform agreements on the geography of a lawsuit into a promise not to remove to a federal court within the agreed geography. In *Periodical Graphics, Inc. v. Spitz*, 1994 WL 502506 (E.D. Pa. 1994), the court

distinguished the Third Circuit's *Foster* case. The relevant portion of the Periodical Graphics

Employment Agreement reads:

> The Employee irrevocably and unconditionally agrees that in the event of any violation
> of the restrictions referred to in Section 6(a) above, an action may be commenced for
> preliminary and permanent injunctive relief and other equitable relief *in any federal or
> state court of competent jurisdiction sitting in Philadelphia or Montgomery County*,
> Pennsylvania, or if the Employee then resides in Tennessee in Davidson or Sumner
> County, Tennessee, or in any other court of competent jurisdiction. *The Employee hereby
> waives*, to the fullest extent permitted by law, *any objection* that he may now or hereafter
> have *to such jurisdiction or to the laying of the venue of any such suit*, action or
> proceeding brought in such a court and any claim that such suit, action or proceeding has
> been brought in an inconvenient forum.

*Id.* at *1 (emphasis added). Applying language similar to that in Section 6.9 of the Cross License

Agreement, the court in *Periodical Graphics* refused to remand because "the forum selection

clause . . . indicate[d] an agreement to certain geographical locations for the convenience of the

parties rather than a waiver of the defendant's rights to removal." *Id.* at *3 (alteration added).

Accordingly, the forum selection clause is not determinative of the outcome of Sanyo's

motion to remand.

### B. Sanyo's Claims and Intel's First Counterclaim Do Not Pass the *Gunn* Test

Sanyo's motion to remand is granted because Intel fails to show that Sanyo's state law

claims and Intel's first counterclaim implicate federal jurisdiction. Because there is no dispute

that Sanyo's claims and Intel's first counterclaim are state law claims, Intel must show that an

issue of patent law is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4)

capable of resolution without disrupting the federal-state balance approved by Congress." *Gunn*,

568 U.S. at 258.

#### i. Necessarily Raised

A federal issue is "necessarily raised" by a claim if the court must address that issue in order to resolve the claim. *See Gunn*, 568 U.S. at 259 (issue of patent law was "necessary" to a case where a court would have to apply it to resolve the plaintiff's state law-based legal malpractice claim); *Grable*, 545 U.S. at 345 (federal issue necessarily raised where the United States government's compliance with a federal statute was an "essential element" of the plaintiff's claim).

Here, no federal issue is "necessarily raised." Sanyo claims that Intel incorrectly informed third parties, including Lenovo, that Hera's patent rights are exhausted because Sanyo authorized Intel to make or sell wireless communication modules under patents Sanyo sold to Hera in 2011. (*See* D.I. 2, Ex. A at ¶¶ 9, 13, 21, 22, 96, 110, 112, 118, 119, 127). Additionally, Sanyo claims that Intel's misrepresentations created uncertainty as to its legitimate rights under the Cross License Agreement and interfered with Sanyo's ability to perform its contractual obligations to Hera. (D.I. 2, Ex. A at ¶¶ 147-78).

To resolve that uncertainty and remedy the harm, Sanyo presently seeks both a declaration that it did not authorize Intel to make or sell wireless communication modules and damages arising from Intel's tortious conduct. Intel's first counterclaim for breach of the Cross License Agreement is a state law claim concerning which products Intel is licensed to make or sell under the Cross License Agreement. (*See* D.I. 16, at 8). Thus, the core question raised by Sanyo's claims and Intel's first counterclaim is whether Intel may rightfully make or sell wireless communication modules used in Lenovo's computers. This is purely an issue of state law contract interpretation that does not arise "under any Act of Congress relating to patents," 28 U.S.C. §§ 1338(a), 1454, or otherwise require the application or interpretation of patent law.

11

While it is hypothetically possible to resolve Sanyo's claims and Intel's first counterclaim by looking at it from an exhaustion standpoint, it is not necessary because the controversy may be resolved by determining whether Intel may rightfully make or sell wireless communication modules used in Lenovo's computers under the terms of the Cross License Agreement—a matter of state law contract interpretation. Accordingly, Sanyo's claims and Intel's counterclaims do not necessarily raise a federal patent issue.

### ii. Actually Disputed

A federal issue is "actually disputed" where the parties are in disagreement regarding its potential application or resolution. *See, e.g., Gunn*, 568 U.S. at 259 (where parties disagreed on whether a particular exception to the "on-sale bar" might have operated to save a patent from being declared invalid, the Court found that federal law was "actually disputed" in the case).

If it were assumed that an issue of patent law were "necessary" to decide Sanyo's claims and Intel's first counterclaim, then Sanyo would of course dispute that their patent rights were exhausted, while Intel would maintain that Sanyo's patent rights were exhausted and that the patents at issue are invalid. But because the other *Gunn* factors have not been met, the Court need not make a finding on this issue. *Manning*, 772 F.3d at 163.

### iii. Substantial

With regard to whether a federal issue is "substantial," the Supreme Court has clarified that "it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will *always* be true when the state claim 'necessarily raise[s]' a disputed federal issue, as *Grable* requires." *Gunn*, 568 U.S. at 260 (emphasis and brackets in original). Rather, "[t]he substantiality inquiry under *Grable* looks . . . to the importance of the issue to the

federal system as a whole." *Id.* The Supreme Court's decisions in *Gunn*, *Grable*, and *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921), help to illustrate the "substantiality" factor.

In *Smith*, the plaintiff's claim questioned the constitutionality of a federal statute permitting the issuance of certain bonds. 255 U.S. at 198. That federal issue was "substantial" not because it was integral to the resolution of the parties' case, but because it called into question both the constitutionality of a federal law, and the validity of all bonds that the government had issued under that statute. *See Gunn*, 568 U.S. at 261 (discussing *Smith*, 255 U.S. at 201).

Similarly, in *Grable*, the plaintiff's claims turned on whether the federal government had provided "notice within the meaning of the [relevant] federal statute" before seizing and selling the plaintiff's real property. 545 U.S. at 315. Stressing the federal government's strong interest in collecting delinquent taxes and in satisfying delinquent tax obligations by seizing property, as well as the government's "direct interest in the availability of a federal forum to vindicate its own administrative action," the Court determined that the interpretation of the tax statute in question was "an important issue of federal law that sensibly belongs in a federal court." *Id.*; *see also Gunn*, 568 U.S. at 260-61 (discussing *Grable*).

In *Gunn*, a legal malpractice action, the plaintiff alleged that, had his counsel invoked a specific patent law doctrine in the underlying case, the United States District Court would not have declared his patent invalid. 568 U.S at 255. In applying the *Grable* factors to determine if federal courts could properly exercise "arising under" jurisdiction over the plaintiff's claims, the Supreme Court found that, while those claims necessarily raised a disputed federal issue, that is, the court would have to conduct a "case within a case," and resolve issues of patent law, to determine if the plaintiff would have prevailed in the underlying action had his attorneys made a

13

certain argument, *id.* at 259, the issues were not sufficiently "substantial" to justify federal

subject matter jurisdiction, *id.* at 260-64. In reaching that decision, the Court stressed that

"[b]ecause of the backward-looking nature of a legal malpractice claim, the question is posed in

a merely hypothetical sense . . . No matter how the state courts resolve the hypothetical 'case-

within-a-case,' it will not change the real-world result of the prior federal patent litigation. [The

plaintiff's] patent will remain invalid." *Id.* at 261.

The Supreme Court has described three nonexclusive factors that may help to inform the

substantiality inquiry, none of which is necessarily controlling. *NeuroRepair, Inc. v. The Nath

Law Group*, 781 F.3d 1340 (Fed. Cir. 2015); *see MDS (Can.) Inc. v. Rad Source Techs. Inc.*, 720

F.3d 833, 842 (11th Cir. 2013); *see also Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 570

(6th Cir. 2007). First, a substantial federal issue is more likely to be present if a "pure issue of

[federal] law" is "dispositive of the case." *Empire Healthchoice Assurance, Inc. v. McVeigh*,

547 U.S. 677, 700 (2006). Second, a substantial federal issue is more likely to be present if the

court's resolution of the issue will control "numerous other cases." *Id.* Third, a substantial

federal issue is more likely to be present if "[t]he Government . . . has direct interest in the

availability of a federal forum to vindicate its own administrative action." *Grable*, 545 U.S. at

315.

### 1. No pure issue of federal law is dispositive

Although resolution of the claims could involve the application of substantive patent law

principles, it is not clear that any particular substantive patent law issue or issues would need to

be resolved. Sanyo's claims and Intel's first counterclaim depend primarily on the particular

scope of the Cross License Agreement rather than the interpretation of federal patent law.

This case is therefore unlike cases where a distinct issue of federal law was dispositive of the case. *See, e.g., Gunn,* 568 U.S. at 259-60 (finding the viability of an experimental-use argument to be actually disputed and central to resolution of the case, but concluding this issue was not substantial in the relevant sense); *Grable,* 545 U.S. at 311 (noting the underlying dispute centered on whether 26 U.S.C. § 6335 required personal service rather than service by mail); *Jang v. Bos. Scientific Corp.,* 767 F.3d 1334, 1336 (Fed.Cir.2014) (noting "Jang's right to relief ... depends on ... whether the stents sold by [petitioners] would have infringed [Jang's patents]"). Instead, the present matter involves a question of federal law, at most, as only one of several elements needed to prevail. *See Empire Healthchoice,* 547 U.S. at 701 ("[I]t takes more than a federal element to open the 'arising under' door.") (internal quotation marks and citation omitted); *see also Mikulski,* 501 F.3d at 571 (even if the federal issue is resolved in their favor, "plaintiffs must still prove the remaining elements of fraudulent misrepresentation (such as intent) or breach of contract (such as the existence of a contract).").

## 2. The court's decision is unlikely to control numerous other cases

In arguing the resolution of the present matter will affect "subsequent litigation," or more specifically *Hera v. Lenovo*, Intel suggests that if a state court adjudicates this case, "it could alter the course of the *Hera v. Lenovo* infringement case[.]" (D.I. 16, at 15). Moreover, Intel asserts that "inconsistencies could arise between state court and federal court decisions on these issues." (*Id.*). This argument is unpersuasive. "If a federal court finds a defendant liable for infringing a valid patent notwithstanding a prior state court determination of invalidity, it is self-evident the state court decision did not 'control' the later federal court case." *NeuroRepair*, 781 F.3d at 1346. "If the state court action would neither affect the scope of any live patent nor require resolution of a novel issue of patent law, it is unclear how it could control numerous

other cases or impact the federal system as a whole." *Id.* In this case, state court rulings could impact the outcome of one case, namely, the *Hera v. Lenovo* case, but that does not automatically give this Court jurisdiction over the present case. Sanyo's claims and Intel's first counterclaim rise and fall with the determination of whether or not Intel has the right to make or sell wireless communication modules under the Cross License Agreement. If Intel lacks the right, Lenovo's exhaustion defense in *Hera v. Lenovo* would fail to meet the exhaustion doctrine's requirement of an authorized sale. Whether or not such a state court finding would apply to a federal case involving different parties, however, is questionable.

### 3. The government does not have a direct interest in the availability of a federal forum to vindicate its own administrative action.

"[Q]uestions of [federal] jurisdiction over state-law claims require careful judgments about the nature of the federal interest at stake." *Grable*, 545 U.S. at 317 (internal quotation marks and citation omitted). *Grable* involved a dispute over title to real property, a quintessential state law matter. *See Or. ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378 (1977) ("This Court has consistently held that state law governs issues relating to . . . real property, unless some other principle of federal law requires a different result."). The central issue, however, was whether the Internal Revenue Service, in seizing Grable's property to satisfy a delinquent tax debt and later selling the property to the defendant, had failed to notify Grable "in the exact manner required by [26 U.S.C.] § 6335(a)." *Grable,* 545 U.S. at 311. Resolution of the dispute required a determination of whether § 6335(a) required personal service or allowed service to be made by certified mail, *id.,* a determination that would directly impact IRS practices, *see id.* at 315. In finding federal jurisdiction proper, the Court noted the government's "strong interest in the prompt and certain collection of delinquent taxes," and the

16

importance of ensuring the IRS could "satisfy its claims from the property of delinquents." *Id.* at 315 (internal quotation marks omitted). Given these considerations, the government had "a direct interest in the availability of a federal forum to vindicate its own administrative action." *Id.*

"The federal interest asserted to be at stake in the present matter is far more nebulous than in *Grable*." *NeuroRepair*, 781 F.3d at 1347. Intel argues that "the patent exhaustion and invalidity issues here are not hypothetical; nor is the relief requested by either Sanyo or Intel confined in impact to them alone." (D.I. 16, at 20). Intel further argues that the remedies sought by the Parties in this case "could alter the course of the *Hera v. Lenovo* case and affect the interests of Hera, Sisvel, and Lenovo." (*Id.*). But Intel's arguments "do not convincingly establish the USPTO or any other government agency has a 'direct interest' in the outcome of this dispute, which is between private parties and relates to" state law contract and tort claims. *See NeuroRepair*, 781 F.3d at 1347.

Accordingly, considering the three factors, any federal issue, assuming one is necessarily raised, is not substantial.

### iv. Federal-State Balance

Finally, when examining whether an issue is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress," *Gunn*, 568 U.S. at 258, a court must consider whether an exercise of jurisdiction would "materially affect, or threaten to affect, the normal currents of litigation," *Grable*, 545 U.S. at 319. In essence, this factor requires courts to examine whether an exercise of jurisdiction would force categories of cases traditionally brought in state court into the federal system. *See Gunn*, 568 U.S. at 264 (noting the States have a "special responsibility for maintaining standards among members of the licensed

professions," and concluding: "We have no reason to suppose that Congress—in establishing exclusive federal jurisdiction over patent cases—meant to bar from state courts state legal malpractice claims simply because they require resolution of a hypothetical patent issue." (internal citations and quotation marks omitted)); *Grable*, 545 U.S. at 319 (comparing the "rare" type of case before the Court, which would not impact the ordinary division of responsibilities between the state and federal judiciaries if federal subject matter jurisdiction were found to exist, with the situation in *Merrell Dow*, 478 U.S. 804, which "would thus have heralded a potentially enormous shift of traditionally state cases into federal courts.").

To the extent federal interests are implicated by Sanyo's and Intel's state law claims, they do not outweigh the interest of the state in regulating that state's commercial agreements. *See Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 ("Commercial agreements traditionally are the domain of state law. State law is not displaced merely because the contract relates to intellectual property which may or may not be patentable . . . ."). Since *Gunn*, courts considering alleged violations of a variety of state laws have declined to find federal question jurisdiction notwithstanding the presence of an underlying issue of patent law. *See, e.g., Forrester Envtl. Servs. Inc. v. Wheelabrator Techs., Inc.*, 715 F.3d 1329 (Fed. Cir. 2013) (tortious interference with a contractual relationship); *MDS (Can.)*, 720 F.3d at 842 (breach of contract); *Mirowski Family Ventures, LLC v. Bos. Scientific Corp.*, 958 F. Supp. 2d 1009 (S.D. Ind. 2013) (breach of patent license agreement); *Airwatch LLC v. Good Tech. Corp.*, 2014 WL 1651964 (N.D. Ga. Apr. 24, 2014) (defamation); *Bonnafant v. Chico's FAS, Inc.*, 17 F. Supp. 3d 1196 (M.D. Fla. 2014) (state whistleblower legislation). Thus, even if a substantial issue of patent law were necessarily raised and actually disputed, Sanyo's claims and Intel's first counterclaim would not

meet the *Gunn* test because conferring jurisdiction would impermissibly disrupt the approved federal-state balance.

In sum, federal jurisdiction is lacking here under *Gunn* because no federal issue is necessarily raised, because any federal issues raised are not substantial in the relevant sense, and because the resolution by federal courts of Delaware contract and tort claims that do not raise substantial issues of federal law would usurp the important role of state courts in regulating commercial agreements within their jurisdiction, disrupting the federal-state balance approved by Congress.

## C.    The Court Lacks Jurisdiction Over Intel's Second and Third Counterclaims

Intel's second and third counterclaims seek declarations of patent exhaustion and invalidity, both of which are defenses to an action for patent infringement.  In declaratory judgment cases "[w]here the complaint . . . seeks in essence to assert a defense to an impending or threatened . . . action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court."  *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 248 (1952).

Here, the Court must "have jurisdiction over a patent infringement complaint brought by [Sanyo] as plaintiff[ ]" for it to exercise jurisdiction over the counterclaims of invalidity and patent exhaustion brought by Intel. *See Bisignano v. Inselberg*, 2016 WL 4487853, at *9 (D.N.J. Aug. 25, 2016).  If the declaratory judgment defendant could not have brought the threatened infringement action, then the Court must dismiss the declaratory judgment action.  *See ExcelStor Technology, Inc. v. Papst Licensing GmbH & Co. KG*, 541 F.3d 1373, 1376-77 (Fed. Cir. 2008) (holding that federal court lacked jurisdiction where declaratory judgment defendant could not

bring an infringement action against plaintiff); *Speedco, Inc. v. Estes*, 853 F.2d 909, 913 (Fed. Cir. 1988) (court lacked jurisdiction where declaratory judgment plaintiff could only be sued for breach of contract, not for patent infringement).

Sanyo does not own the Wi-Fi Patents. Intel does not dispute this fact, whether by challenging the assignments that have been recorded with the Patent Office or otherwise. (*See* D.I. 2, Ex. B at Counterclaim ¶ 17; D.I. 13.). Because it has no ownership interest in the Wi-Fi Patents and is not an exclusive licensee, Sanyo is incapable of bringing an action for patent infringement against Intel under those patents. *See Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1317 (Fed. Cir. 2010) (*quoting Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008) ("[O]nly a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit[.]")); *ExcelStor Tech.*, 541 F.3d at 1376-77. Moreover, Sanyo has never threatened Intel with an infringement action over the Wi-Fi Patents. (D.I. 12, at 13). Despite this, Intel asks this Court to determine that the Wi-Fi Patents— patents that Sanyo no longer owns—are "invalid over prior art" and have been exhausted as to the products accused of infringement by Hera. (D.I. 2, Ex. B at Counterclaim ¶¶ 55-64).

Intel's request that this Court find the Wi-Fi Patents invalid, and that Sanyo's rights as to those patents are exhausted, is improper. Just as Sanyo lacks standing to bring an infringement suit against Intel, so too does Intel lack standing to seek a declaratory judgment against Sanyo of invalidity or patent exhaustion. *See Bisignano*, 2016 WL 4487853, at \*9-10 (remanding to state court where declaratory judgment counterclaimant failed to allege that its opponent owns the patents); *GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, 2014 WL 7263537, at \*3 (D. Ariz. Dec. 9, 2014) ("In declaratory judgment actions for patent invalidity and noninfringement, a plaintiff lacks standing when the defendants have insufficient interest in the patents in question such that

the defendants would be unable to enforce the patents against infringement.") (citing *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1094 (Fed. Cir. 1998)); *Barnes & Noble, Inc. v. LSI Corp.*, 823 F. Supp. 2d 980, 983 (N.D. Cal. 2011) ("In a case brought as a declaratory relief claim, a district court must dismiss the complaint where the party sued is neither the patent owner or the exclusive licensee of the patent owner.").

Because Intel has no standing to bring these declaratory judgment actions, this Court lacks jurisdiction over Intel's second and third counterclaims.

## IV.    Conclusion

For the foregoing reasons, Sanyo's Motion to Remand (D.I. 11) is GRANTED.

An appropriate order will be entered.